IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

```
SOUTHERN DISTRICT OF MISSISSIPPI
        F I L E D

      JUL 2 8 2009

     J. T. NOBLIN, CLERK
BY_____DEPUTY
```

UNITED STATES OF AMERICA,
*ex rel.*, JULIE FARMER                                        PLAINTIFF

v.                          CIVIL ACTION NO. 3:09cv441HTW - LRA

MADISON-RANKIN-SIMPSON-COPIAH MENTAL HEALTH COMMISSION REGION 8;
RONALD DAVID VAN JR.;
NENA WILLIAMS;
DAVE BLEDSOE;
JULIE THIBODEAUX; and
RICA GRAY                                                     DEFENDANTS

_____

## COMPLAINT

_____

*Qui tam* relator, Julie Farmer, by her undersigned attorneys, hereby alleges as follows:

1. This is a civil action brought on behalf of the United States of America under the False Claims Act, 31 U.S.C. §§ 3729-3732, as amended by the False Claims Act Amendments of 1986 and the Fraud Enforcement and Recovery Act of 2009.  Relator brings this civil action under the *qui tam* provisions of the federal False Claims Act.

### Venue and Jurisdiction

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 and 31 U.S.C. §§ 3730(b) and 3732(a).

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a).  At least one of the defendants resided in this district or was doing business in this district at all times material to this action.  The claims set forth in this Complaint arose, at least in part, in this district.  31 U.S.C. § 3732(a) provides that in actions such as this one brought under

31 U.S.C. § 3730 venue is proper in any judicial district where at least one of multiple

Defendants can be found, resides, transacts business, or where any act proscribed by 31 U.S.C. §

3729 occurred.

### The Parties

4.  *Qui tam* relator Farmer is a United States citizen and a resident of the State of

Mississippi.  Farmer was employed by Madison-Rankin-Simpson-Copiah Mental Health

Commission Region 8 ("Region 8") as a children's mental health case manager (and de facto

behavioral specialist) between January 26, 2009 and May 14, 2009.  The allegations contained

herein are based on Farmer's direct and independent knowledge of Defendants' business

practices.

5.  Region 8 is a registered 501(c)(3) entity with its principal place of business in

Brandon, Mississippi (employer identification number 64-0584893).

6.  Ronald David Van, Jr. is the Executive Director of Region 8 and is an adult resident of

Mississippi.

7.  Nena Williams is the Clinical Director of Region 8 and is an adult resident of

Mississippi.

8.  Dave Bledsoe is the Center Director of the Simpson County, Mississippi office of

Region 8 and is an adult resident of Mississippi.

9.  Julie Thibodeaux is the Clinical Director of the Simpson County, Mississippi office of

Region 8 and is an adult resident of Mississippi.

10.  Rica Gray is the Supervisor of Children's Services of the Simpson County,

Mississippi office of Region 8 and is an adult resident of Mississippi.

## FACTUAL ALLEGATIONS

*Region 8*

11.  Region 8 is a non-profit community rehabilitation program established pursuant to Mississippi Code Section 37-33-101, *et seq.,* for the purpose of "training, rehabilitating, restraining, and developing individuals with disabilities to become more productive citizens" in Simpson, Copiah, Rankin, and Madison County, Mississippi.

12.  Upon information and belief, Region 8 began its operations in the 1970s and continues to operate today.

13.  Region 8 provides various services for children, including case management services, psychiatric care, therapy, behavioral modification, and preschool day treatment.

14.  Day Treatment is defined by Medicaid as "a behavioral intervention program, provided in the context of a therapeutic milieu, which provides children/adolescents with serious emotional disturbances the intensity of treatment necessary to enable them to live in the community."

15.  The majority of Region 8's minor clients pay for their treatment through Medicaid.

16.  In June 1997, Ronald David Van, Jr. assumed leadership of Region 8 as Executive Director.  At this time, Region 8 was more than $400,000 in debt and had less than $2,000 in reserves.

17.  As reflected on Region 8's 2006 tax return, between 1997 and 2006 Region 8's net worth inflated to $30,343,658.

18.  Region 8's financial "turnaround" is a direct result of the company-wide policy or custom, as established by Executive Director Van and implemented by the above-named

defendants and others, to defraud Medicaid and other government assistance programs.

*Relator Julie Farmer's Background*

19. Relator Farmer is a married working mother with four children, three of whom are school age children.

20. In her mid-30s, Relator Farmer returned to college to pursue a psychology degree and her dream of becoming a care provider in the mental health field.

21. Relator Farmer graduated from college in May 2008 and began working for Region 8 on January 26, 2009.

*January 26, 2009 - February 9, 2009:  Relator Farmer's Training at Region 8*

22. After two days of general orientation at Region 8's Brandon campus, Relator Farmer began working at Region 8's Simpson County facility as a case manager for forty-eight preschool age clients of Region 8.

23. Between January 28, 2009 and February 9, 2009, Defendants Dave Bledsoe, Julie Thibodeaux,  Rogina Mister, Yolanda Watts, and Rica Gray trained or instructed Relator Farmer as to Region 8's policies and customs.  Rogina Mister was Relator Farmer's primary trainer during this period.

24. On her first day of training at Simpson County, Defendant Mister instructed Relator Farmer that she would be responsible for billing a minimum of six hours per day as "direct case management - child," under billing code 252, and that it was "best to get eight billed hours."

25. It is the policy of Region 8, as conveyed through Defendant Center Director Bledsoe, that case managers keep a tally of their billable hours on a Service Activity Log ("SAL").  Case managers must account for each hour of the work day on a SAL and provide the appropriate

billing code for the time spent on each entry during the day.

26.  During this nine day "training" period, Defendant Mister - an adult patient case manager - advised Relator Farmer as to Region 8's billing policies and how to conduct case management interviews.  Indeed, during her training period, Region 8 required that Relator Farmer accompany Mister on her monthly case management visits with adult patients.  During these "visits," Farmer observed Mister run personal errands, shop at Wal-Mart, watch television, and sit on the couch at a patient's group home and do homework, all while billing the client as though she was providing direct client services.  During one of these visits to Defendant Mister's adult patient group home, Mister told Farmer that her goal was to keep the patient's in the group home as long as possible.

27.  During their training sessions, Defendant Mister instructed Relator Farmer that it was standard procedure to bill the client for "direct client interaction" for time spent reviewing case notes, preparing patient progress notes, doing paperwork, and traveling to and from the patient's location.  Additionally, Defendant Mister informed Relator Farmer that all case management billing should be recorded in "at least" thirty minute intervals, as opposed to the 15 minute intervals required by Medicaid.  Both during her training period and after she began working as a case manager, Defendant Mister reviewed Relator Farmer's SALs and specifically directed Relator Farmer to bill administrative time and missed appointments to patients as direct case management services; otherwise, Mister told Farmer, "You aren't going to make your hours."

28.  Defendant Yolanda Watts, Relator Farmer's predecessor as children's case manager and current behavioral specialist, also instructed Relator Farmer during her training period. Defendant Watts repeatedly instructed Relator Farmer that "to make your hours, you need to ride

the bus." Defendant Watts specifically directed Farmer to ride Region 8's buses during pick-ups and drop-offs as often as possible, pick one child, and bill 90 minutes for face-to-face case management time to that child, regardless of how long that child was actually on the bus. Typically, the actual bus ride only lasted 30-60 minutes. During those bus rides, no actual face-to-face management actually took place.

29. Further, the policy of billing 90 minutes each time a case manager rode a Region 8 bus was confirmed by Defendant Mister, and this practice of over-billing was systematically perpetrated by the case management staff at Region 8. Indeed, other case managers - who were not responsible for the children's case management in any way - would approach Farmer to inquire as to which children they could "ride the bus with." As part of this overarching policy, Defendant Mister instructed Relator Farmer and other case managers that they should bill this "on the bus case management" time as though the services were provided at the child's home.

***February 10, 2009 - March 16, 2009: Relator Farmer's Time as a Case Manager at Region 8***

30. On February 10, 2009, Relator Farmer assumed full responsibility as the children's case manager for Region 8's Simpson County facility.

31. Relator Farmer was charged with providing case management services to forty-eight children under Region 8's care, and she was required to "make contact" with each child or the child's guardians at least once during each monthly period.

32. During this time period, Defendant Mister continued reviewing Relator Farmer's SALs and instructed Farmer that when she went to a patient's house and the parent was absent, not to indicate "administrative time" or "no contact time" on her SALs and instead to bill the next patient visited for that driving time.

-6-

33.  As in Relator Farmer's training period, both Defendants Watts and Mister repeatedly instructed Relator Farmer to "ride the bus" so that she could "make her hours."

**March 17, 2009 - May 13, 2009: Hiding Children in the "Overflow Classroom"**

34.  At the daily staff meeting on or about March 13, 2009, without any prior consultation with Relator Farmer, Simpson County Center Director Dave Bledsoe informed the employees that Relator Farmer would be starting a "new" preschool day treatment classroom. This classroom was termed the "fifth classroom" or the "overflow classroom."

35.  According to Defendant Bledsoe, the overflow classroom was only temporary and was necessary because an audit was being conducted.

36.  Subsequently, Defendant Julie Thibodeaux informed Relator Farmer that the overflow classroom was a permanent addition to Region 8.

37.  As part of her duties as the instructor of the overflow classroom, Relator Farmer kept a roster of the children in attendance.

38.  The overflow classroom was segregated away from the other children's classes. While all other preschool day treatment occurred at the main Simpson County campus, the overflow classroom was located across Highway 13 from the main campus in an old storage building behind Region 8's alcohol and drug facility. This classroom was littered with rat feces, and rats often ate food intended for the children.

39.  The children in the overflow classroom endured substandard and unacceptable conditions. Relator Farmer was provided with virtually no teaching or cleaning supplies for her classroom. The overflow classroom lacked basic necessities for children, such as a water fountain. Further, rat feces littered the floor, tables, and drawers of the classroom.

-7-

40.  Pursuant to the applicable regulations, preschool day treatment classrooms are limited to nine students per class.

41.  The purpose of the overflow classroom - as related to Relator Farmer by Defendant Bledsoe - was that Region 8 had too many students per classroom (48 split among 4 teachers, rather than 36), and that the "extra" children needed to be kept in the overflow classroom.

42.  Pursuant to the applicable regulations, a master's degree is required for "behavioral specialists" at a preschool day treatment class.

43.  Relator Farmer repeatedly explained to Defendants Bledsoe and Gray that she did not have the necessary educational background to work as a behavioral specialist.  Each time Relator Farmer made such a comment, she was assured that her role as a behavioral specialist was proper and that Region 8 could obtain Farmer a "waiver" to provide services with only a bachelor's degree but would need to enroll in an online masters program.

44.  Along with providing five hours of classroom service per day, Rica Gray told Relator Farmer that she was still required to bill at least six direct case management hours daily.  When Relator Farmer inquired as to when such services should be provided, she was told to do so "on the bus" in the morning and the afternoon.

45.  While serving as a de facto behavioral specialist, Relator Farmer turned in two SALs per day: one for her "case management" role and one as a "behavioral specialist."

46.  During this time period, Relator Farmer purchased supplies out of her own pocket for her class and attempted to maintain her case management schedule as best she could.

47.  When the behavioral specialists would have absences in their classroom, they would approach Relator Farmer and request the identity of a Medicaid recipient patient in her

classroom.  That behavioral specialist would then report that the student was in the specialists'

classroom - and bill Medicaid accordingly - rather than Relator Farmer's, even though the

student remained in Farmer's classroom.  The behavioral specialist would scratch the child's

name out on Relator Farmer's classroom roster to indicate to the accounting office which student

would be fraudulently reported as being in the behavioral specialist's classroom and place her

initials to the right of the child's name.  This was done directly at the direction of Defendant

Gray, who received all of the behavioral specialists billing paperwork at the end of each business

day.

 48.  According to Medicaid, day treatment "is the most intensive outpatient program

available to children and adolescents, [and it] should provide an alternative to residential

treatment or acute psychiatric hospitalization or serve as a transition from these services."

Region 8, however, treated its day treatment classes more like day care than intensive training

designed to address "serious emotional disturbances."

***The Week Immediately Preceding the May 14, 2009 Audit***

 49.  At a staff meeting the week before May 14, 2009, Clinical Director Bledsoe

announced that an audit was going to be conducted of the Simpson Count facility.  Bledsoe told

the assembled staff that "there is nothing to worry about" and that the auditors "want to find out

how we are so successful."

 50.  Prior to the scheduled May 14, 2009 audit of the Simpson County facility, Defendant

Julie Thibodeaux - at the instruction of her supervisors - implemented a "record cleaning"

process by which Region 8 sought to purge the evidence of its fraudulent activities from the files.

 51.  As part of this purge, the behavioral specialists were instructed to review children's

files to ensure that all Medicaid billing requirements were met and, if not met, fabricate the proof necessary to comply with Medicaid's requirements.  Region 8 employees were expressly instructed to search for and forge unsigned "consent to bill Medicaid" forms.

52.  Defendant Thibodeaux provided the behavioral specialists, including Relator Farmer, with computer printouts of all Medicaid billing by patient.

53.  The behavioral specialists were instructed to check each patient's Medicaid billing data; particularly, whether the patient's "absences" and "presents" corresponded to the Medicaid billing charts.

54.  On at least four instances in one of these files, Defendant Thibodeaux expressly told Relator Farmer to change Region 8's records to reflect that a student was present when in fact that child was absent.  Farmer refused.

55.  After the behavioral specialists were instructed to alter Region 8's records, Beth Neese (who was serving as a behavioral specialist without the required master's degree) told Relator Farmer that she made numerous changes to her patient's files.

***May 14, 2009: The Day of the Audit***

56.  On May 13, 2009, Defendant Rica Gray informed Relator Farmer that she should go directly to her classroom and not attend the 8:00 morning meeting the following day.

57.  When Relator Farmer asked Defendant Thibodeaux about Defendant Gray's instructions, and Thibodeaux told Farmer, laughingly, that she "hoped her class wouldn't be included in the audit."

58.  The morning of May 14, 2009, instead of Relator Farmer's children being dropped off at the main Simpson County facility (as they normally were), the Region 8 bus dropped the

children off directly at the overflow classroom.  Similarly, the children were picked up directly from the overflow classroom.

59.  Defendant Thibodeaux then told Relator Farmer that she and Defendant Nena Williams (Clinical Administrator of Simpson County) were "up until 3a.m. dealing with files."

60.  When Relator Farmer confided her concerns about the foregoing departures from the norm to Defendant Yolanda Watts, Watts told Farmer that - in the past when audits were conducted - she would take the "extra" children to the park so that the auditors would not see them.

61.  On the morning of May 14, 2009, Relator Farmer went to Defendant Gray and confronted her about hiding the overflow children from the auditors and the fraudulent case management billing that occurred at Region 8.  Defendant Gray responded that "at one point" she too felt that Region 8's policies were ethically wrong.  When Relator Farmer stated that she "couldn't do it anymore," Defendant Gray replied, "Only you know what you can do."

62.  Relator Farmer then resigned but agreed to stay until the end of the day to assure the safety of the children in the overflow classroom.

63.  Defendant Bledsoe - who had left the facility - was informed that Relator Farmer was leaving Region 8.

64.  Relator Farmer was in the parking lot when Defendant Bledsoe arrived at the facility.

65.  Defendant Bledsoe approached Relator Farmer and asked her what her problem was. Relator Farmer replied that hiding the children was wrong, and she would not do it any longer. Defendant Bledsoe explained, "We only hide children during the audits and only to avoid any unnecessary questions."

66. Defendant Bledsoe then said, "Mr. Van is the most devout Christian man I know, and he wouldn't do anything to hurt these children." Bledsoe went on to say, "If Mr. Van's God is good enough for him, he should be good enough for anyone."

67. Further, Defendant Bledsoe said, "We'll get you another job, just don't bail."

68. Relator Farmer declined Bledsoe's offer and then turned in her keys and paperwork.

69. While in the building, Relator Farmer watched out a window while Defendant Bledsoe loaded boxes of documents in his vehicle before leaving.

70. The following day, Relator Farmer engaged counsel to ensure that she would be shielded from responsibility for Region 8's fraudulent and illegal practices.

***Since the May 14, 2009 Audit***

71. Since Relator Farmer was forced to resign, she and her family have been under tremendous financial and psychological strain.

72. Relator Farmer incurred substantial debt to pursue her bachelor's degree to qualify her for a position at Region 8, and she left a steady paying job to work for Region 8.

73. Since leaving Region 8, Relator has learned that Region 8 employees have altered hundreds of adult patient files in anticipation of an audit by the Mississippi Division of Medicaid. The purpose of these alterations is to cause auditors to believe that Region 8 was entitled to payments from Medicaid when, in truth and in fact, it was not.

### THE FRAUD

74. Defendants have engaged in systematic fraud for the purpose of obtaining for defendant Region 8 payments from Mississippi Medicaid to which Region 8 was not entitled by law.

75.  Defendants submitted claims to Medicaid for more time than actually spent with Medicaid beneficiaries.

76.  Defendants submitted claims to Medicaid for "therapy" when Region 8 employees actually were engaged in activities other than patient care, including, but not limited to, watching television, shopping, traveling to and from service locations, riding the bus, exercising, and studying.

77.  Defendants submitted claims to Medicaid for beneficiaries who did not receive services from qualified providers.

78.  Defendants submitted claims to Medicaid for pre-school beneficiaries who were in an "overflow classroom" and were not receiving qualified services from a qualified provider.

79.  Defendants submitted claims to Medicaid for pre-school patients who were assigned to classrooms with more students than allowed by applicable Medicaid regulations.

80.  Defendants submitted time-based claims to Medicaid in 30, 60, or 90-minute increments rather than in 15-minute increments as required by applicable Medicaid regulations.

81.  Defendants submitted claims to Medicaid for beneficiaries who were not behaviorally or educationally challenged and therefore did not qualify for the Medicaid services for which Region 8 made claims.

82.  Defendants billed Medicaid for home visits with parents when no parents were present in the home.

83.  Defendants billed Medicaid for "therapy" services rendered each day during adolescent Medicaid beneficiaries' two-hour "nap time," during movie time, during "quiet time," and/or while children were on the playground.

-13-

84.  Defendants altered records and forged hundreds of adolescent Medicaid beneficiary files for the purpose of deceiving auditors, concealing Defendants' fraud, and making it appear that Defendants complied with applicable Medicaid regulations when, in truth and in fact, they had not.

85.  Defendants altered records and forged hundreds of adult Medicaid beneficiary files for the purpose of deceiving auditors, concealing Defendants' fraud, and making it appear that Defendants complied with applicable Medicaid regulations when, in truth and in fact, they had not.

86.  Defendants billed Medicaid falsely under a "school-based" code when Medicaid should have been billed under a "day treatment" code.

87.  Defendants billed Medicaid under an "06" "place of service" code for adolescent treatment when services were in fact provided "in center" and should have been billed under an "05" "place of service" code.

88.  Defendants billed Medicaid for beneficiaries who had ceased treatment and were receiving no services whatsoever from Defendants.

89.  Defendants billed Medicaid for treatment provided to beneficiaries whose treatment plans were written by non-physician Region 8 employees rather than by licensed physicians.

90.  Defendants billed Medicaid for "therapy" services provided to adult Medicaid beneficiaries when those beneficiaries actually were participating in Region 8's "Clubhouse" where no reimbursable services were being provided.

## COUNT I

Claim By and on Behalf of the United States under the False Claims Act  (Presenting False Claims)

91.  Plaintiff realleges and incorporates by reference paragraphs 1 through 90 as though fully set forth herein.

92.  This is a claim under the False Claims Act,  31 U.S.C. §§ 3729-33, as amended.

93.  The Plaintiff/Relator, Julie Farmer, has standing to maintain this action by virtue of 31 U.S.C. §3730(b).

94.  By virtue of the acts described herein, Defendants knowingly presented false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1), as amended.

95.  By virtue of the false claims presented or caused to be presented by Defendants, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT II

Claim By and on Behalf of the United States under the False Claims Act (False Records or Statements)

96.  Plaintiff realleges and incorporates by reference paragraphs 1 through 90 as though fully set forth herein.

97.  This is a claim on behalf of the United States under the False Claims Act,

31 U.S.C. §§ 3729-33, as amended.

98. The Plaintiff/Relator, Julie Farmer, has standing to maintain this action by virtue of 31 U.S.C. §3730(b).

99. By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the Government, Defendants caused to be made or used false records or statements to get false or fraudulent claims paid or approved by an agency of the United States Government, in violation of 31 U.S.C. § 3729(a)(2).

100. By virtue of, and as a result of, the false records and statements used to get false claims paid by the Government, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT III

Claim By and on Behalf of the United States under the False Claims Act (Conspiracy to Submit False Claims)

101. Plaintiff realleges and incorporates by reference paragraphs 1 through 90 as though fully set forth herein.

102. This is a claim under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

103. The Plaintiff/Relator, Julie Farmer, has standing to maintain this action by virtue of 31 U.S.C. §3730(b).

104. By virtue of the acts described herein and the agreement of the Defendants to

undertake those acts for a wrongful purpose, Defendants conspired together and with others to defraud the government in order to get false or fraudulent claims paid by the Mississippi Medicaid program, in violation of 31 U.S.C. § 3729(a)(3), as amended. In furtherance of the conspiracy, Defendants acted to affect the objects of the conspiracy alleged herein.

105. By virtue of the false claims presented or caused to be presented by Defendants, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $11,000 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor:

1.     On Counts I - III, under the federal False Claims Act, against Defendants for treble the amount of the actual damages suffered by the United States (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

2.     For all costs of this civil action; and

3.     For such other and further relief as the Court deems just and equitable.

WHEREFORE, relator Julie Farmer demands and prays that judgment be entered in her favor:

1.     On Counts I - III, under the federal False Claims Act, for a percentage of all civil penalties and damages obtained from Defendants, reasonable attorney's fees, and all costs

-17-

incurred against Defendants; and

      2.      Such other relief as the Court deems just and proper.


                            Respectfully submitted,


                            J. Cliff Johnson II (Mississippi Bar #9383)
                            J. Brad Pigott

                            ATTORNEYS FOR RELATOR JULIE FARMER


Pigott Reeves Johnson, P.A.
775 N. Congress Street
Post Office Box 22725
Jackson, Mississippi 39225-2725
Telephone:  (601) 354-2121
Facsimile: (601) 354-7854